## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT CHARLES CLASS A, L.P., on Behalf of Itself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>J.P. MORGAN CHASE & CO., J.P. MORGAN CLEARING CORP., J.P. MORGAN SECURITIES LLC, J.P. MORGAN FUTURES, INC. (now known as J.P. MORGAN SECURITIES LLC), and JOHN DOES 1-50,<br><br>      Defendants. | Case No. 20-cv-3206<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Robert Charles Class A, L.P. ("RCA" or "Plaintiff"), through its undersigned attorneys for its class action complaint against J.P. Morgan Chase & Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities LLC, and J.P. Morgan Futures, Inc. (collectively, "J.P. Morgan") and John Does 1-50 hereby states on personal knowledge and otherwise on information and belief as follows:

### INTRODUCTION

1.      For years, J.P. Morgan has manipulated U.S. Treasury futures markets through a deceptive and illegal trading strategy called "spoofing."  It continues to do so. This action seeks actual damages and other relief under the Commodity Exchange Act, 7 U.S.C. §1, *et seq*.

2.      Beginning in 2009, and continuing through the present, J.P. Morgan entered orders to buy or sell U.S. Treasury futures instruments on commodity exchanges operated by the Chicago Mercantile Exchange ("CME") and/or the Chicago Board of Trade ("CBOT") even

though it never intended to execute those orders ("Deceptive Orders"). J.P. Morgan further took steps to ensure that the orders would never be executed. J.P. Morgan's spoofing violated the Commodity Exchange Act, 7 U.S.C. §1, *et seq.* (the "CEA").

3.     J.P. Morgan itself has recently confirmed and revealed that there are criminal and regulatory investigations into the unlawful spoofing conduct in U.S. Treasury futures alleged by Plaintiff. J.P. Morgan filed an annual report Form 10-K with the Securities Exchange Commission on February 25, 2020, disclosing:

> Various authorities, including the Department of Justice's Criminal Division, are conducting investigations relating to trading practices in the metals markets and related conduct. The Firm also is responding to **related requests concerning similar trading-practices issues in markets for other financial instruments, such as U.S. Treasuries**."[1]

4.     The *Wall Street Journal* has also reported regarding such conduct, writing "[a]ccording to people familiar with the matter, the investigation also is probing the bank's trading in futures."[2]  The investigation involves prosecutors within the DOJ Criminal Division's fraud section and includes offices from the CFTC.[3]

5.     Spoofing is a manipulative trading strategy whereby a market participant places large orders with no intention of ever filling the order. Seeing these orders on their trading screens and not knowing they are false, other traders in the market will adjust their pricing and/or order size to fit the perceived shift in supply and demand. Once the market moves in the spoofing

---

[1]     JPMorgan Chase & Co. 2019 Form 10-K, at 280-281 (Feb. 25, 2020), https://jpmorganchaseco.gcs-web.com/node/315401/html (last accessed May 27, 2020).

[2]     Dave Michaels, *Government is Broadening Investigations of Spoofing-Like Practices*, WALL STREET JOURNAL (Mar. 17, 2020) https://www.wsj.com/articles/government-is-broadening-investigations-of-spoofing-like-practices-11584446400 (last accessed May 27, 2020).

[3]     Global Investigations Review, *DOJ Expands JPMorgan Spoofing Probe* (Mar. 17, 2020) https://globalinvestigationsreview.com/short-cut/2020/march/17 (last accessed May 27, 2020).

trader's favor, the order is removed, as was always intended. These orders are referred to herein as "Deceptive Orders."

6.      J.P. Morgan's Deceptive Orders created an artificial appearance of market demand and artificial prices that in turn induced other market participants to act. For example, market makers would adjust their bid and ask prices up or down and/or post more quantity at a particular bid or ask price to follow this artificial price and/or supply, believing that it represented a true reflection of market sentiment. Non-market maker participants would trade on other bids and offers, or choose not to trade, based on the belief that J.P. Morgan's Deceptive Orders were intended to be executed.

7.      But once the market moved in the direction of J.P. Morgan's Deceptive Orders, J.P. Morgan cancelled the Deceptive Orders. At the same time, J.P. Morgan placed orders in the *opposite* direction of its Deceptive Orders for the same Treasury instrument at the same price as the Deceptive Orders ("Aggressor Orders"). J.P. Morgan then took advantage of the movement that the artificial prices of its Deceptive Orders had caused by cancelling the Deceptive Orders and turning around to purchase or sell those instruments at the now artificially low or high prices and quantities, all to the detriment of those traders who acted based on the (false) belief that the Deceptive Orders were legitimate and intended to be executed.

8.      J.P. Morgan deployed this fraudulent and deceptive spoofing scheme across the full range of Treasury futures. This strategy was repeated tens of thousands of times during numerous trading days from 2009 to the present. Every time it did so, J.P. Morgan was able to manipulate the Treasury futures markets to the detriment of Plaintiff and other market participants.

9.     Defendants have a history of employing spoofing to manipulate the prices of futures. They likewise have a history of regulatory investigations into such conduct. For example, in 2018, the U.S. Department of Justice ("DOJ") criminally charged several of Defendants' employees for their roles in manipulating the prices of precious metals futures contracts.  Those charged included Michael Nowak, the head of the precious metals trading desk, as well as traders John Edmonds and Christian Trunz. Edmunds and Trunz have since pled guilty and are cooperating with the ongoing criminal investigation. These same individuals are subject to civil penalties and sanctions by the Commodity Futures Trading Commission ("CFTC").

10.     While some details of the regulatory investigations have been made public, Defendants' actions are concealed and secretive, and were conducted on futures markets in which participants' activities are largely shielded by anonymity in order to protect proprietary trading strategies. Defendants, indeed, were facilitated in the concealment of their illegal conduct by the anonymity afforded to traders in the U.S. Treasury futures market. Therefore, discovery in this action will reveal more evidence supporting the allegations in this Complaint.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because the action arises under the Commodity Exchange Act, 7 U.S.C. §1, *et seq*.

12.     Venue is proper in this District because the acts giving rise to the complaint occurred in Chicago, Illinois.

## PARTIES

13.     Plaintiff Robert Charles Class A, L.P. ("RCA") is a California limited partnership, which, at all relevant times, maintained its principal place of business in San Diego, California. Plaintiff RCA transacted in Treasury futures during the Class Period, including purchases and

sales of futures on the CBOT. Plaintiff RCA transacted in Treasury futures contracts and options on those contracts during the Class Period and was injured and suffered losses from trading at artificial prices proximately caused by Defendants' unlawful manipulation. Defendants spoofed the market for Treasury futures throughout the Class Period, which deprived Plaintiff RCA and the Class of the ability to transact in a lawful market that was free of manipulation. These artificial prices caused Plaintiff RCA to earn less profits or suffer greater losses in its trading of Treasury futures during the Class Period.

14.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a Delaware company and its principal place of business is located at 277 Park Avenue, New York, New York 10172. JPMorgan operates as a subsidiary of Defendant J.P. Morgan Chase & Co. During the Class Period, JPMorgan, including its predecessors, served as a primary dealer of U.S. Treasury securities and transacted in U.S. Treasury-based instruments, including Treasury futures.

15.     Defendant J.P. Morgan Chase & Co. ("JPMC") is a Delaware corporation headquartered at 270 Park Avenue, New York, New York 10005. JPMC is a multinational banking and financial services corporation.

16.     Defendant J.P. Morgan Clearing Corp. is a Delaware corporation headquartered at 4 Chase Metrotech Center, Brooklyn, New York 11245. J.P. Morgan Clearing Corp. offers securities and futures clearing, settlement, lending, and related services to traders, hedge fund managers, broker-dealers, and investment advisors. It also provides operational and administrative services for registered broker-dealers.

17.     Defendant J.P. Morgan Futures, Inc. (now known as and merged into J.P. Morgan Securities LLC) was a Delaware corporation headquartered in New York, New York until June

1, 2011, when it was acquired by Defendant J.P. Morgan Securities LLC. Collectively, the individual J.P. Morgan Defendants are collectively referred to herein as "J.P. Morgan."

18.    Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Treasury Futures. The defined term "Defendants" also includes John Doe Defendants.

19.    During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Treasury futures, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

20.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

21.    Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

### A.    Overview of Treasury Futures

22.    The U.S. Treasury continuously sells securities (bonds, bills, and notes) to investors at public auctions. They are sold through investment companies and banks, and the proceeds are used to fund the federal government and to finance public debt. These securities are

sold at fixed terms (2-year, 3-year, 5-year, 7-year, 10-year, 20-year, and 30-year), with U.S. Treasury bonds having original maturities of twenty or thirty years and U.S. Treasury T-Notes having maturities of between two and ten years. They are also sold at fixed interest rates which are determined by the prevailing interest rates in the market when sold, and pay interest every six months. Although the securities are initially sold at auction, there is a robust secondary market for them. The yields on U.S. Treasuries are used in pricing many instruments.

23.     A Treasury Future is a contract in which one person agrees to buy or sell a U.S. Treasury security at a certain price at some stated date in the future. Treasury futures are available for nearly all of the Treasury benchmark tenors (two-year, five-year, 10 year, and 30 year), and the CME Group also offers "Ultra 10-Year Notes" and "Ultra T-bond futures."[4]   In practice, most participants trade Treasury futures with the intent of either closing out the futures position or rolling them into longer expiry futures contracts before the specified settlement date.

24.     When trading a U.S. Treasury futures contract on the CME, an investor can either buy the future (which is called going "long" or taking a "long" position) or sell the future (which is called going "short" or taking a "short" position). An investor taking a long position in a U.S. Treasury futures contract is buying the contract now (at what they believe will be a low price) in order to sell it (to close out the position) or settle it (at the settlement date) at what they believe will be a higher price. An investor taking a short position in a U.S. Treasury futures contract is selling the contract now (at what they believe is a high price) in order to buy it (to close out the position) or settle it (at the settlement date) at what they believe will be a lower price.

---

[4]     The CME does not offer a futures contract linked to either the 7-year T-note or the 20-year Treasury bond, the latter of which only began trading on May 21, 2020, after a 34 year absence. The CME claims to offer a 3-year T-Note futures contract, but trading in it appears to be de minimis, and there is no options version of the contract.

25.     The CME also has created options on all of its regularly traded U.S. Treasury futures contracts. An option contract is a type of financial derivative that gives the buyer the right – but not the obligation as with a futures contract – to either buy or to sell a U.S. Treasury futures contract at a predetermined price ("strike price"), on or before a specified date in the future (the "expiration date"). To obtain this option, the buyer of the option pays a premium to the option seller.

26.     A "put" or "put option" in a given U.S. Treasury futures contract is a financial contract that gives the owner the right, but not the obligation, to sell an agreed quantity of that U.S. Treasury futures contract at the strike price, by or on the expiration date. A "call" or "call" option in a given U.S. Treasury futures contract is a financial contract that gives the owner the right, but not the obligation, to buy an agreed quantity of that U.S. Treasury futures contract at the strike price, by or on the expiration date.

27.     The CME's U.S. Treasury options are American-style, meaning they can be exercised at any time before the expiration date. Whether an option is exercised depends on whether it is "in-the-money" or "out-of-the-money."  An in-the-money call option is one where the strike price is below the current price of the underlying asset, whereas an in-the-money put option is one where the strike price is above the current market price of the underlying asset. An out-of-the-money call option is one where the strike price is above the current price of the underlying asset, whereas an out-of-the-money put option is one where the strike price is below the current market price of the underlying asset.

28.     U.S. Treasury futures and options are very actively traded. According to the CME, the April 2020 average daily trading volume for U.S. Treasury futures was: 360,973 for the 2-year T-Note futures contract; 633,723 for the 5-year T-Note futures contract; 1,090,599 for

the 10-year T-Note futures contract; 204,067 for the 30-year Treasury Bond futures contract; 172,561 for the Ultra 10-year Note futures contract; and 130,000 for the Ultra T-Bond futures contract.

29.    Average daily volume for April 2020 in the options version of most of these contracts was similarly high: 15,961 for 2-year T-Note Options; 142,972 for 5-year T-Note Options; 328,375 for 10-year T-Note Options; and 64,665 for 30-year Treasury Bond Options (the Ulta 10-Year Note Options and Ultra T-Bond Options had minimal average daily volume in April 2020).

30.    Each Treasury Future has a face value at maturity of $100,000, with the exceptions of 2-year and 3-year futures that have a face value at maturity of $200,000. Prices are quoted in ticks per $2,000 for 2- and 3-year futures, and ticks per $1,000 for all other futures.

31.    According to the CME, "U.S. Treasury futures and options provide a wide variety of market participants around the globe with the ability to adjust their interest rate exposure. Futures and options on Treasury Bonds and Notes are key tools for those who wish to manage their interest rate risk, as well as those who wish to take advantage of price volatility. ... Among the most liquid products in the world, U.S. Treasury futures and options lend themselves to a variety of risk management and trading applications, including hedging, income enhancement, duration adjustments, interest rate speculation and spread trades. The availability of U.S. Treasury futures and options on CME Globex further enhances the efficiency of trading these products, providing nearly 24-hour access for users around the world."[5]

---

[5]    *See* https://www.cmegroup.com/trading/interest-rates/files/IR-179_USTreasury_FO_Fact_Card.pdf (last accessed May 29, 2020).

### B.    Treasury Futures Platforms

32.    CBOT Treasury futures are one of CME's core interest rate products and have been for decades. They currently primarily trade through CME Globex, though certain option contracts remain traded through open outcry. U.S. Treasury futures currently traded on the CME include: (i) 2-year T-Note futures; (ii) 5-year T-Note futures; (iii) 10-year T-Note futures; (iv) U.S. Treasury Bond futures; (v) Ultra 10-year T-Note futures; and (vi) Ultra US Treasury Bond futures.[6]

33.    The CME operates platforms that permit participants to electronically trade Treasury futures. These exchanges display "order books" to market participants that show the best (highest) bid and best (lowest) ask prices for a particular Treasury future contract at that moment in time. The best available bid price is referred to as the "top of the book bid." The best available ask price is referred to as the "top of the book offer."

34.    In addition, the order books display the total contract size available to all market participants. When multiple bids or asks are pending at the same price, the platforms assign priority to those orders based on which orders were entered first, otherwise known as "first in, first out" (or "FIFO") priority wherein the oldest order entered is matched first. When two orders are matched, the trade is executed.

35.    A typical order book display is as follows:

---

[6]    The CBOT merged with the CME in 2007. The CBOT is now a subsidiary of the CME.



36.    Trading on these platforms is anonymous, and the identity of any trader behind a specific bid or ask is unknown to market participants. As quotes are anonymous, market participants cannot tell at the time if Defendants repeatedly placed and then cancelled orders (*i.e.*, "spoofed").

## C.    J.P. Morgan's Spoofing Strategy

37.    Defendants used spoofing to manipulate the U.S. Treasury markets by submitting and then withdrawing orders they never intended to fill solely for the purpose of moving the market in their favor. The spoofing orders created the false appearance of demand to either buy or sell certain Treasury instruments. As a result, the spoofing orders induced other market participants to enter sell orders below, or buy orders above, what would otherwise have been the prevailing market price and quantity. In addition, other market participants maintained positions below or above what would otherwise have been the prevailing market price and quantity (perhaps by adding additional quantities to a preexisting bid or ask). Market participants made

11

these trading decisions based on what appeared to be a legitimate change in supply or demand. The Deceptive Orders harmed market maker participants that were induced into changing or not changing their preexisting bid or ask prices or amounts based on the false appearance of demand, as well as non-market maker participants that bought or sold, or chose not to buy or sell, certain quantities based on the false appearance of supply or demand.

38.    After entering the Deceptive Orders and inducing others to modify their trading behavior, J.P. Morgan then "flashed" the market by cancelling its Deceptive Orders while simultaneously entering Aggressor Orders for the same instrument on the opposite side of the Deceptive Order. These Aggressor Orders matched with the bids or asks that were generated because of the now-withdrawn Deceptive Orders. This allowed J.P. Morgan to buy or sell Treasury instruments from other market participants at artificially high or low prices or quantities that were induced by its own Deceptive Orders.

39.    The DOJ, in a release related to a similar J.P. Morgan spoofing investigation, recently stated that its criminal division "is committed to prosecuting those who undermine the investing public's trust in the integrity of our commodities markets through spoofing or any other illegal conduct."[7]

40.    J.P. Morgan's spoofing had several repeated, defining characteristics demonstrating that its sole intent in placing the Deceptive Orders was to manipulate the market:

41.    *First*, the Deceptive Orders represented, on average, an unusually large size of the posted bid at the best available price. As discussed further below, the size of the Deceptive Orders ensured that they would have a large impact on the entire market.

---

[7]    Press Release, *DOJ, Former Precious Metals Trader Pleads Guilty to Commodities Fraud and Spoofing Conspiracy* (Nov. 6, 2018), https://www.justice.gov/opa/ pr/former-preciousmetals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy (last accessed May 28, 2020).

42.     It is highly unusual in the Treasury futures markets for a trader to place such large orders relative to the current size of the order book, especially large orders subsequently cancelled over and over again. Instead, J.P. Morgan could have entered its large orders as partially visible "iceberg" orders, which are massive orders that are split up into smaller limit orders for the purpose of disguising the true aggregate order size, that would not create such a strong market reaction. If J.P. Morgan truly intended to execute such a large quantity of its Deceptive Orders, it would have placed them as iceberg orders so as not to prompt significant market reactions. But by entering orders that were both disproportionally large and visible compared to the size of the preexisting order book, J.P. Morgan ensured its Deceptive Orders would induce a strong market reaction.

43.     *Second*, the Deceptive Orders were often placed at the same price as the best bid or offer price. Because of the first in, first out ("FIFO") method of matching and execution, this consistent pattern ensured that the Deceptive Orders would have a strong impact on the market while still making it highly unlikely that those orders would be executed.

44.     *Third*, these large Deceptive Orders were typically cancelled within milliseconds of J.P. Morgan entering its Aggressor Orders.

45.     *Fourth*, the Deceptive Orders were entered and cancelled along with the appearance of subsequent Aggressor Orders across multiple different Treasury futures all at once.

46.     *Fifth*, the Aggressor Orders were often the exact size and price needed to take all available liquidity remaining after the cancelled Deceptive Orders, meaning that the trader making the Aggressor Orders knew that the Deceptive Orders would be cancelled and knew the precise amount of liquidity that would remain thereafter. The Aggressor Orders were routinely

the exact size necessary to wipe out the amount remaining at the artificially induced prices and quantities. This is evident of a pre-planned spoofing strategy. It is highly unlikely that a single trader would change his or her mind within milliseconds in such a coordinated manner with respect to sweeping most or all the remaining book across multiple platforms and instruments, day after day.

### D.    The Deceptive Orders Affected the Market

47.    The Deceptive Orders were intended to be, and operated as, false pricing signals that interfered with the natural functioning of the markets. In effect, the Deceptive Orders were the bait that induced other market participants to follow suit based on their belief that those orders represented legitimate demand or supply, when in reality the orders created a trap that enabled J.P. Morgan to trade at artificially low or high prices and quantities.

48.    An oft-used measure of the strength of the market is the weighted average ratio ("WAR") between the bid and the offer. WAR is the ratio of the size of the bids relative to the sum of the size of the bids and offers [Bid Size / (Bid Size + Offer Size)]. The closer to zero the WAR is, the weaker the bid and the stronger the offer. The closer to one the WAR is, the stronger the offer and the weaker the bid. Traders use WAR as a signal of the value of a given security at a point in time.

49.    A balanced market with equal quantities of orders for both the bids and the offers would have a WAR of 0.5, which means the theoretical market price is halfway between the bid and offer. For example:



50.     When a trader places additional offers, the WAR decreases accordingly, meaning the theoretical price of that security is now closer to the bid. Using the example above, if the offer size becomes $100 million instead of $50 million, then the WAR shifts to 0.33. As a result, traders would believe the theoretical value of that security is now closer to the bid price rather than halfway between the bid and offer price.



51.     Thus, simply by placing orders on one side, J.P. Morgan sent false pricing signals that led other traders to believe the theoretical value of that Treasury instrument had moved to one side or the other (depending on the side of J.P. Morgan's Deceptive Orders). In effect, additional Deceptive Orders, even if placed at a price previously set by someone else, influence theoretical value and, thus, actual trading. The larger the quantity of the Deceptive Orders, the greater the impact on the security's theoretical and actual value.

52.     J.P. Morgan's use of such large orders to shift the WAR while those large orders sat shielded behind other, much smaller orders, reflects its intent to skew market perception of value while simultaneously making it very unlikely that its Deceptive Orders would be executed.

53.     Below is an example of classic spoofing behavior that occurred on March 18, 2019 in the June 2019 U.S. Treasury Long Bond Contracts market. It illustrates in real time how spoofing induces a buyer to pay the manipulated price caused by the spoofing entity.

54.    On the observation date, 143 ($14.3 million) June 2019 Treasury Long Bond Contracts were purchased for a price of 146.1875, which was the offered side of the inside market at the time of purchase. The bid side of the market at the time was 146.15625.

55.    The buyer paid the offer side because at the time stamp 15:36:46.149 (CST), the current market bid and offer prices were:

| Bid | Offer | Bid Size | Offer Size |
|---|---|---|---|
| 146.15625 | 146.1875 | 319 | 1000 |

56.    But within 67 milliseconds (7% of one second) of this purchase, 74 order book updates (routed orders or changes to the order book) occurred ***without any trades or cancelations occurring***. In that extremely short period of time, it is impossible that more than one participant could have made those 74 changes.

57.    As a result of the order book updates the amount on the bid and offer, rose to:

| Bid | Offer | Bid Size | Offer Size |
|---|---|---|---|
| 146.15625 | 146.1875 | 1433 | 684 |

58.    The spoofing party made it appear that there were more investors looking to buy at 146.15625 (the bid price) than investors looking to sell at 146.1875 (the offer price). This abrupt imbalance between bid and offered amounts lured investors wanting to buy the contracts to buy them at the offered price (146.1875) rather than wait to have them sold to them at the bid price (146.15625).

59.    Then, at 15:36:46.216 (CST), based upon this new data, 13 trades on 143 contracts occurred within a half second thus raising the offer price of 146.1875 on those 143

contracts. At the exact same time, the remaining 541 (of the 684) contracts offered ***disappear***
***completely from the order book***.

60.    Next, at 15:36:46.728 (CST) the new best bid shown in the order book has been
inflated to 146.1875 and then, mere seconds later, at 15:36:49.514 (CST) the bid moves back
down to the original market seen at the outset of this example, 146.15625 (bid) and 146.1875
(offer).

61.    Therefore, due to the spoofing conduct, buyers on the bid were lured to meet the
higher offer for 143 contracts. By buying the 143 contracts at 146.1875 as opposed to the earlier
market price of 146.15625, the buyer overpaid $4,468.75.

62.    The above illustrative example is just one of many that can be observed
throughout the Class Period using available data.

E.    **J.P. Morgan's Spoofing Damaged Plaintiff and the Class**

63.    J.P. Morgan is a major player in the futures market, clearing on more than 70
exchanges and conducting electronic trading on more than 50 exchanges.[8]  It serves (via trade
execution or clearing services) a variety of customers who transact in exchange-traded futures
and options on futures contracts.[9]  Its  futures commission merchant ("FCM") division,
Defendant J.P. Morgan Securities LLC, ranks among the world's largest FCMs[10] and is "one of

---

[8]    *Id.*

[9]    *See* "Commodity Futures Trading Commission Rule 1.55(K) And 1.55(O): FCM-Specific
Disclosure Document" for J.P. Morgan Securities LLC, https://www.jpmorgan.com/jpmpdf/
1320748305451.pdf (last accessed May 27, 2020) (listing customer categories including,
Institutional (asset managers, pension funds, insurance companies, banks, hedge funds); Private
Bank (individuals); Commercial (corporates, agricultural, energy); Proprietary (HFT, family
offices)).

[10]    Based on CFTC data, J.P. Morgan ranked as the second largest FCM as of December 31,
2018. *See* "2019 Top FCMs," MANAGEDFUTURESINVESTING.COM (Feb. 19, 2019),
https://www.managedfuturesinvesting.com/2019-top-fcms/ (last accessed May 27, 2020).

the most highly capitalized market leaders in the futures and options brokerage business" that "has been at the forefront of many of the practices and services that have become standard in the futures and options industry."[11]

64.    As part of this massive business, J.P. Morgan actively trades in Treasury futures. As of December 31, 2017, J.P. Morgan had approximately $4.9 billion of outstanding notional value in exchange-traded (including interest rate futures contracts).

65.    Treasury futures are and were during the Class Period an important part of J.P. Morgan's fixed income business. The segment was given fiscal and media attention, including partnering with the high-frequency trading firm, Virtu Financial Inc., to improve the efficiency of Treasury trading operations by employing sophisticated electronic trading strategies, including global algorithmic trading products, for futures products.

66.    J.P Morgan's spoofing harmed Plaintiff in two separate ways. First, the spoofing caused Plaintiff to execute orders to buy or sell Treasury futures with J.P. Morgan or other market participants at artificial prices and quantities. Second, J.P. Morgan's trading induced Plaintiff into modifying its trading behavior to its own detriment once those Deceptive Orders were cancelled and the crossing Aggressor Orders were entered. Whenever RCA's orders were hit by J.P. Morgan's Aggressor Orders (or were hit by another participant following J.P. Morgan's strategy), RCA's trading strategy would, in turn, shift to meet the market.

67.    J.P. Morgan's spoofing thus caused trading losses for RCA and all Class members who also transacted in Treasury futures during the Class Period.

---

[11]    *See* "Futures & Options and OTC Clearing," J.P. MORGAN MARKETS, https://www.jpmorgan.com/jpmpdf/1320613563458.pdf (last accessed May 27, 2020).

F.    **J.P. Morgan's History of Spoofing**

68.    J.P. Morgan has faced multiple regulatory enforcement actions across various markets alleging that it has engaged in manipulative trading practices. In 2013, J.P. Morgan paid a civil penalty of $285 million and agreed to disgorge $125 million in profits from "manipulative bidding strategies" to settle claims brought by the Federal Energy Regulatory Commission that J.P. Morgan had manipulated power markets in California and the Midwest.[12]    In 2015, J.P. Morgan  paid a criminal fine of $550 million as part of a plea agreement stemming from its market-rigging of the foreign exchange spot market.[13]

69.    More recently, federal regulators have sought fines and criminal sanctions against Defendants and their employees for spoofing and other manipulation of the futures markets. To wit, Bloomberg encapsulated the government's allegations with the headline, "JPMorgan's Metals Desk Was a Criminal Enterprise, U.S. Says."[14]  The regulatory findings and disciplinary proceedings against Defendants demonstrate that they developed a practice of manipulating the market through spoofing to increase their profitability at the expense of other investors.

70.    In addition, the DOJ and CFTC have already charged several of Defendants' employees with manipulating the precious metal futures market. They are charged with a campaign of manipulation and spoofing – placing orders and then canceling them to trick other

---

[12]    *See* https://www.reuters.com/article/us-jpmorgan-ferc/jpmorgan-to-pay-410-million-to-settle-power-market-case-idUSBRE96T0NA20130730 (last accessed May 29, 2020).

[13]    *See U.S. v. JP Morgan Chase & Co.* (D. Conn. 2015), Plea Agreement, dated May 19, 2015, https://www.justice.gov/file/440491/download (last accessed May 27, 2020).

[14]    *See, e.g.*, Tom Schoenberg and David Voreacos, *JPMorgan's Metals Desk was a Criminal     Enterprise,     U.S.     Says*,     BLOOMBERG     (Sept.     16,     2019), https://www.bloomberg.com/news/articles/ 2019-09-16/jpmorgan-s-metals-desk-was-a-criminal-enterprise-u-s-says (last accessed May 27, 2020).

market participants – that spanned nearly a decade. According to the DOJ, more than a dozen individuals participated in the manipulation.

71.    To date, two traders at J.P. Morgan have pled guilty to commodities fraud and a spoofing conspiracy in the precious metal futures markets while some have also settled related civil claims with the CFTC.[15]   Among the former metals traders that pled guilty is Christian Trunz who, on August 29, 2019, pled guilty to both spoofing and a conspiracy to engage in spoofing. In the plea allocution, Trunz admitted that between July 2007 and August 2016, he placed thousands of orders that he did not intend to execute for precious metals futures contracts traded on CME Group-operated exchanges. Tellingly, Trunz admitted that he learned to spoof from more senior traders and that his own spoofing was done with the "knowledge and consent of his supervisors and is cooperating with authorities."[16]

72.    The other trader to plead guilty to a spoofing conspiracy was John Edmonds. In the announcement of his guilty plea, the DOJ stated that he engaged "in a sophisticated scheme to manipulate the market for precious metals futures contracts for his own gain by placing orders that were never intended to be executed. . . ."  Edmonds, too, admitted that he learned spoofing from more senior traders and that his immediate supervisors were aware of and consented to his hundreds of instances of spoofing.

73.    These two guilty pleas – and the details that they revealed – show that spoofing was pervasive and prevalent at J.P. Morgan, that it was known of at many levels, and that scores

---

[15]    Press Release, *supra* note 3.

[16]    *Id*.

of employees engaged in it. In fact, federal prosecutors have said that more than a dozen of Defendants' employees ultimately helped make manipulative spoof trades.[17]

74.    Prosecutors also noted that J.P. Morgan employed an advanced method of spoofing – namely, J.P. Morgan traders layered multiple Deceptive Orders at different prices in rapid succession that, in the aggregate, if not individually, were substantially larger than the visible portion of the opposite-side genuine order. This new style of "layering" was more difficult both to execute and to detect.[18]

75.    The investigations and charges have not been limited to these two traders, either. On November 15, 2019, the DOJ charged four of Defendants' senior employees, including those supervising Trunz and Edmonds and other traders on the precious metals desk: Jeffrey Ruffo (executive director who specialized in hedge fund sales); Gregg Smith (managing director of the trading desk); Michael Nowak (managing director and head of the precious metals desk); and Christopher Jordan (executive director and metals trader). The charges against them include: one count of conspiracy to conduct the affairs of an enterprise involved in interstate or foreign commerce through a pattern of racketeering activity (*i.e.*, a "RICO" conspiracy); one count of conspiracy to commit wire fraud affecting a financial institution; bank fraud; commodities fraud; price manipulation; and spoofing.

---

[17]    *See* Bradley Hope, *High-Frequency Trading Firm Virtu Partners with J.P. Morgan Chase*, WALL STREET JOURNAL (Aug. 3, 2016), https://www.wsj.com/articles/high-frequency-trading-firm-virtu-partners-with-j-p-morgan-chase-1470237145 (last accessed May 27, 2020). Notably, Virtu Financial was previously targeted by the SEC in connection with a probe into allegations of spoofing by HFTs. *See* John McCrank, *Exclusive: SEC targets 10 firms in high frequency trading probe – SEC document*, REUTERS (July 17, 2014), https://www.reuters.com/article/us-sec-investigation-highfrequencytradin/exclusive-sec-targets-10-firms-in-high-frequency-trading-probe-sec-document-idUSKBN  0FM2TW20140717 (last accessed May 27, 2020).

[18]    Superseding Indictment, *U.S. v. Gregg Smith, Michael Nowak, Jeffrey Ruffo, and Christopher Jordan*, No. 19 CR 669 (EEC) (N.D. Ill. Nov. 14, 2019), ECF No. 52, ¶26e.

76.     Specifically, the 14-count indictment alleges, *inter alia*, that:

The Defendants and their co-conspirators placed orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution, including in an attempt to artificially affect prices and to profit by deceiving other market participants. More specifically:

a.     In thousands of trading sequences, the Defendants and their coconspirators placed one or more orders for precious metals futures contracts that they intended to execute ("Genuine Orders"). Sometimes, but not always, the Genuine Orders were iceberg orders, so that other market participants could see only a portion of the order's full size at any given time.

b.     During the same trading sequences, the Defendants and their coconspirators also placed one or more orders that they intended to cancel before execution ("Deceptive Orders") on the opposite side of the market from the Genuine Orders. The Deceptive Orders were not iceberg orders, and so the full order size was visible to other market participants.

77.     Further, the indictment alleged that through placing Deceptive Orders, Defendants' employees sought to inject false and misleading information about the actual supply and demand for precious metals futures contracts and to deceive other market participants into believing that the visible order book accurately reflected market-based forces of supply and demand. As a result, "[t]his false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling precious metals futures contracts at quantities, prices, and times that they otherwise likely would not have traded."[19]

---

[19]     Press Release, DOJ, "Superseding Indictment Charges Former Precious Metals Salesman With Racketeering Conspiracy," (Nov. 15, 2019), https://www.justice.gov/opa/pr/supersedingindictment-charges-former-precious-metals-salesman-racketeering-conspiracy (last accessed May 28, 2020).

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated. The "Class" is defined as:

> All persons or entities that transacted in Treasury futures or options on Treasury futures on a domestic exchange during the period January 1, 2009, through the present (the "Class Period").

79.     Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded from the Class are the United States Government, any judicial officer presiding over this action and their immediate family and judicial staff, and any juror assigned to this action.

80.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold, or held relevant Treasury futures and options on Treasury futures during the Class Period at prices and quantities artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

81.     Plaintiff's claims are typical of the claims of other Class members. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct. No conflict between Plaintiff and the Class members exists.

82.     Plaintiff will fairly and adequately protect the Class's interests. Plaintiff is represented by sophisticated, competent class action counsel experienced in litigating complex

class action litigation involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

83.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members, include, but are not limited to:

    a.  whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated Treasury futures prices;

    b.  the nature and duration of Defendants' manipulation of Treasury futures prices;

    c.  whether manipulation of Treasury Securities prices injected artificial prices into Treasury futures that traded on the CME;

    d.  whether Defendants participated in the Treasury futures market;

    e.  whether Defendants' conduct violated Section 22 of the CEA;

    f.  whether Defendants' conduct acted to aid and abet CEA violations;

    g.  whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

    h.  whether Defendants fraudulently concealed their misconduct from Plaintiff and the Class; and

    i.  the appropriate class-wide measure of relief for the Defendants' CEA violations.

84.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

85.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

86.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

87.     During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Treasury futures market.

88.     Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Treasury futures at a certain price without any  intent to actually execute those orders. Defendants never disclosed that they placed these "sham" orders to manipulate the prices of Treasury futures.  Defendants' manipulation is also inherently self-concealing. Therefore, Plaintiff and the Class could not have discovered it prior to the public disclosures and investigations discussed herein.

89.     Thus, Plaintiff and the Class did not know of Defendants' unlawful acts and could not have discovered them by the exercise of due diligence before February 25, 2020. On that date, Defendants (in their 2019 Form 10-K filing with the SEC) first announced that regulators were requesting information about their Treasury futures business practices.

90.    As a result of the concealment of Defendants' unlawful conduct and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations.

91.    Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**

**Manipulation of Treasury Futures
in Violation of the Commodity Exchange Act
(7 U.S.C. §1, *et seq*. and Regulation 180.2)
(Against All Defendants)**

92.    Plaintiff incorporates the above allegations by reference and realleges them in full.

93.    During the Class Period Defendants intended to and did cause artificial prices of Treasury futures in violation of the CEA, 7 U.S.C. §1, *et seq*., through the use of fictitious spoofed buy and sell orders and other manipulative conduct.

94.    By spoofing the Treasury futures market, Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity in violation of the CEA.

95.    During the Class Period, Treasury futures' prices did not result from the legitimate market information and the forces of supply and demand. Instead, Treasury futures' prices were artificially manipulated by Defendants' spoofing conduct.

96.    Throughout the Class Period, Defendants entered large orders to buy or sell with no intention of actually filling them, instead knowing they would cancel those orders prior to execution. Defendants therefore contaminated the market with false information about supply

and demand to artificially move prices up or down for their own benefit. As a result of this conduct, Plaintiff and the Class were damaged by losses on their Treasury futures trades.

97.    Defendants' manipulative conduct of Treasury futures' prices persisted throughout the Class Period and caused damages to Plaintiff and Class members who purchased or sold at the artificial prices.

98.    As massive market participants, Defendants had the ability to cause and did in fact cause artificial prices of Treasury futures. Defendants were active in the markets for Treasury futures throughout the Class Period and were aware of the effects of spoofing on the markets.

99.    By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§9, 13b, 13(a), and 25(a), throughout the Class Period.

100.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury futures to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

101.    Plaintiff and the Class are each entitled to actual damages sustained in Treasury futures for the CEA violations alleged herein.

### SECOND CLAIM FOR RELIEF

**For Employing a Manipulative and Deceptive Device in Violation of the Commodity Exchange Act, as Amended**
**(7 U.S.C. §1, *et seq*. and Rule 180.1(a))**
**(Against All Defendants)**

102.    Plaintiff incorporates the above allegations by reference and realleges them in full.

103.    Defendants' spoofing conduct, including the use of submitting and cancelling orders and engaging in other manipulative conduct in order to artificially move prices for Treasury futures, constitutes use of a manipulative and deceptive device.

104.    Defendants acted intentionally, or at least acted recklessly, in employing the manipulative and deceptive device. The ability of Defendants' spoof orders to mislead other market participants into believing there was genuine demand for purchasing or selling as represented by the Defendants' deceptive orders must have been known to Defendants.

105.    Defendants knew that their spoof orders would appear in the Order Book and that traders often consider Order Book information in making trading decisions; thus, Defendants were, at a minimum, reckless with respect to the danger that their spoof orders would mislead other market participants.

106.    Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§9 and 25(a), throughout the Class Period.

107.    As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Treasury futures contracts and options on those futures contracts to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

108.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**

**Vicarious Liability in Violation of the Commodity Exchange Act, as Amended**
**(7 U.S.C. §1, *et seq.*)**
**(Against All Defendants)**

109.    Plaintiff incorporates the above allegations by reference and realleges them in full.

110.    Defendants are liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

111.    Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

## PRAYER FOR RELIEF

Plaintiff prays that This Honorable Court grant relief as follows:

A.    That the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that Plaintiff be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.    That the Court award Plaintiff damages, punitive damages, and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relief against Defendants;

E.    That the Court award Plaintiff pre- and post-judgment interest;

F.      That the Court award Plaintiff its costs of suit, including reasonable attorneys'
fees and expenses including costs of consulting and testifying experts; and

G.      That the Court award any and all such other relief as the Court may deem just
and proper.


## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues pursuant to Rule 38(b) of the Federal Rules
of Civil Procedure.

Dated: May 29, 2020                    **KOREIN TILLERY LLC**


  s/ George A. Zelcs
George A. Zelcs (Ill. Bar No. 3123738)
Robert E. Litan
Randall P. Ewing, Jr. (Ill. Bar No. 6294238)
Chad E. Bell (Ill. Bar No. 6289034)
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Telephone: (312) 641-9750
Facsimile: (312) 641-9751

Peter A. Barile III (N.D. Ill. No. 4364295)
Thomas K. Boardman
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
Facsimile: (212) 233-6334
pbarile@scott-scott.com
tboardman@scott-scott.com

Christopher M. Burke
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

cburke@scott-scott.com

Louis F. Burke
**LOUIS F. BURKE PC**
460 Park Avenue
New York, NY 10022
Telephone: (212) 682-1700
lburke@lfblaw.com

*Attorneys for Plaintiff and the Proposed Class*